# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Kellogg Brown & Root Services, Inc. | ) | ASBCA Nos. 56358, 57151 |
| | ) | 57327, 58559 |
| | ) | |
| Under Contract No. DAAA09-02-D-0007 | ) | |

APPEARANCES FOR THE APPELLANT:    Jason N. Workmaster, Esq.
Herbert L. Fenster, Esq.
Raymond B. Biagini, Esq.
Daniel L. Russell, Jr., Esq.
Alejandro L. Sarria, Esq.
John W. Sorrenti, Esq.
  McKenna Long & Aldridge LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
  Army Chief Trial Attorney
Stephanie B. Magnell, Esq.
MAJ Samuel E. Gregory, JA
Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE FREEMAN

In ASBCA Nos. 56358, 57151 and 57327, Kellogg Brown & Root Services, Inc., (KBRS) appeals the deemed denial of its claims under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109, for funds totaling $44,059,024.49 withheld by the government from KBRS' invoices under the captioned cost-reimbursement contract (hereinafter "Contract 0007"). The government's reason for the withholding was that the funds at issue had been previously paid to KBRS for costs of private security companies (PSCs) which the government has subsequently alleged were unallowable under the terms of the contract. In ASBCA No. 58559, KBRS appeals a final decision of the contracting officer asserting a government claim against KBRS under the CDA for the allegedly unallowable PSC costs in the total amount of $55,620,591.55. The appeals were consolidated for hearing. A hearing was held for 24 days, with 24 witnesses and more than 37,000 pages of documents admitted in evidence. We sustain the appeals in ASBCA Nos. 56358, 57151 and 57327 in the total amount claimed plus CDA interest. We dismiss the appeal in ASBCA No. 58559 for lack of jurisdiction.

## FINDINGS OF FACT

1. We assume familiarity with our decision in *Kellogg Brown & Root Services, Inc.*, ASBCA No. 56358, 12-1 BCA ¶ 35,001.

2. On 14 December 2001, the Army Operations Support Command, Rock Island, Illinois, awarded Contract 0007 to "BROWN & ROOT SERVICES, DIV OF KELLOGG, BROWN & ROOT, INC" (R4,[1] tab 1 at 1). After award the contractor changed its name to Kellogg Brown & Root Services, Inc., and the procuring agency had several name changes. In this decision, we refer to the contractor at all times as KBRS and to the procuring agency as "Rock Island."

### Pertinent Terms and Conditions of Contract 0007 and Task Orders Issued Thereunder

3. Contract 0007 was a cost-plus-award-fee, indefinite quantity, indefinite delivery contract with a base period of one year and nine one-year option periods thereafter (R4, tab 1 at 5-26). Contract 0007 was part of the U.S. Army's Logistics Civil Augmentation Program (LOGCAP) and is also referred to as the LOGCAP III contract. LOGCAP was a program for civilian contractors to "provide the Army with an additional means to adequately support the current and programmed force by performing selected services in wartime and other operations" (*id.* at 56).

4. Contract 0007 included among other general provisions, the FAR 52.211-15, DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS (SEP 1990) clause (hereinafter "the DPA clause"); and the FAR 52.216-7, ALLOWABLE COST AND PAYMENT (MAR 2000) clause (hereinafter "the Allowable Cost clause") (R4, tab 1 at 37).

5. The DPA clause stated: "This is a rated order certified for national defense use, and the Contractor shall follow all the requirements of the Defense Priorities and Allocations Systems regulation (15 CFR 700)." The cited regulation stated in pertinent part:

### § 700.3 Priority ratings and rated orders.

(a) Rated orders are identified by a priority rating....Rated orders take preference over all unrated orders as necessary to meet delivery dates....

(b) Persons receiving rated orders must give them preferential treatment as required by this regulation. This

---

[1] We cite to the Rule 4 file in ASBCA No. 56358, unless otherwise noted.

means a person must accept and fill a rated order for items that the person normally supplies....

(c) All rated orders must be scheduled to the extent possible to ensure delivery by the required delivery date.

....

## § 700.7 Compliance

(a) Compliance with the provisions of this regulation...is required by the Defense Production Act.... Violators are subject to criminal penalties.

6. The Allowable Cost clause of Contract 0007 stated in pertinent part:

(a) *Invoicing.* The Government shall make payments to the Contractor when requested as work progresses...in amounts determined to be allowable by the Contracting Officer in accordance with Subpart 31.2 of the Federal Acquisition Regulation (FAR) in effect on the date of this contract and the terms of this contract.

7. FAR 31.201-2, Determining allowability, in effect on 14 December 2001 stated in pertinent part:

(a) The factors to be considered in determining whether a cost is allowable include the following:

(1) Reasonableness.

(2) Allocability.

(3) Standards promulgated by the CAS Board, if applicable; otherwise, generally accepted accounting principles and practices appropriate to the particular circumstances.

(4) Terms of the contract.

(5) Any limitations set forth in this subpart.

8. FAR 31.201-3 Determining reasonableness, in effect on 14 December 2001 stated in pertinent part:

(a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business....

(b) What is reasonable depends upon a variety of considerations and circumstances, including –

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's-length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

9. Contract 0007 also included a "**Section H, Special Contract Requirements – continued**" that stated in pertinent part:

**Special Provisions for Peacetime Contracts**

This general guidance addresses the deployment of contractor personnel into a theater of operations in support of a contingency or exercise.

The general guidance provided by this provision is not all-inclusive nor are all items required for all situations. Each contingency will evolve differently depending upon theatre commander's guidance impacting on the deployment. The Contracting Officer may tailor these provisions as appropriate for individual task orders.

4

In the event that the contractor deploys individuals into the area of operations in support of a contingency or exercise, the following conditions may apply:

## H-13 Management

- The contractor shall ensure that all personnel hired by or for the contractor will comply with all guidance, instructions, and general orders applicable to the U.S. Armed Forces and DoD civilians as issued by the Theater Commander or his/her representative. This will include any and all guidance and instructions issued based upon the need to ensure mission accomplishment, force protection, and safety, unless directed otherwise in the task order SOW.

- The contracting officer is the only authorized official who shall increase, decrease, or alter the scope of work to be performed....

- The contractor shall comply, and ensure that all deployed employees, subcontractors, subcontractors employees, invitees and agents comply with pertinent Service and Department of Defense directives, policies, and procedures, as well as federal statutes, judicial interpretations and international agreements....Host Nation laws....may take precedence over contract requirements.

    ....

## H-16 Force Protection

- While performing duties [in accordance with] the terms and conditions of the contract, the Service Theater Commander will provide force protection to contractor employees commensurate with that given to Service/Agency (e.g. Army, Navy, Air Force, Marine, DLA) civilians in the operations area unless otherwise stated in each task order.

    ....

## H-21 Weapons and Training

- Whether contractor personnel will be permitted to carry a government furnished weapon for self-defense purposes in the Area of Operations (AO) is at the discretion of the Theater Commander. However, Contractor personnel will not possess personally owned firearms in the AO. The government may at its discretion issue weapons and ammunition (M9 Pistols) for self-defense to the contractor employees....If accepted the contractor will maintain a listing of employees possessing a government firearm and provide notification to the Contracting Officer....Also when accepted, only military issued ammunition may be used in the weapon.

- Prior to issuing any weapons to contractor employees, the government at its discretion may provide the contractor employees with weapons familiarization training commensurate to training provided to Department of Defense civilian employees.

- The contractor shall ensure that its employees adhere to all guidance and orders issued by the Theater Commander or his/her representative regarding possession, use, safety, and accountability of weapons and ammunition.

- Upon redeployment or notification by the government, the contractor shall ensure that all government issued weapons and ammunition are returned to government control.

- Contractors will screen employees, and subcontractors, to ensure that employees may be issued a weapon in accordance with U.S. or applicable host nation laws. Evidence of screening will be presented to the contracting officer.

(R4, tab 1 at 96-98, 101-02)

10. Section 1.3.1 of the Contract 0007 Statement of Work (SOW) stated in pertinent part that: "All work to be performed shall be awarded by individual task orders" (R4, tab 1 at 56). Section 7.1 of the Contract 0007 SOW stated in pertinent part:

**7.1 General.** The Contractor is obligated to follow and adhere to the Governing directives and applicable documents as listed in the contract and the SOW. Supplements or amendments to those documents shall be considered to be in full force and effect upon receipt by the Contractor, except when such document is deemed to cause an increase or decrease in the cost of contract performance. In such event, the Contractor shall inform the Contracting Officer in writing prior to implementation of such supplement or change. If applicable, a negotiated change in contract price shall be made to the mutual satisfaction of both the Contractor and Government prior to implementation of the change.

(R4, tab 1 at 79)

11. Following the invasion and occupation of Iraq in March 2003, Rock Island issued a number of task orders under Contract 0007 for logistic and life-support services for the coalition combat forces at designated sites in Iraq. The life-support services included, among other things, billeting and food service operations. (R4, tab 3 at 14-49) Task Order (TO) 59, effective 24 June 2003, with an initial total ceiling price of $802,065,733 and its successor TO 89 effective 1 May 2005, with an initial total ceiling price of $4,972,882,216, were the largest cost-plus-award-fee task orders by dollar amount for these services in Iraq during the years 2003-2006 (R4, tab 3 at 1-2, tab 5 at 1-2).

12. From September 2004 to May 2010 Mr. James Loehrl, a senior executive at Rock Island, was responsible for the Contract 0007 task order procurements (tr. 10/7). At hearing he described the scope of TO 59 as follows:

> Task Order 59 to the best of my recollection encompassed all of the support, logistics support, in Iraq minus some of the theater transportation mission....That was under task order 44.
>
> Also there was some performance that was specific to the State Department in the Green Zone that it didn't cover. And there were some task orders in support of...the Intel folks that were based at Camp Victory that were on a separate

task order. Basically, all of the baseline support in Iraq minus those things is what it covered.

(Tr. 10/57)

13. Paragraph 1.10 in Change 5 to the TO 59 SOW, effective 27 August 2003, stated: "Contractor Force Protection. The government will provide for the security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines." (R4, tab 3 at 99) Paragraph 1.7 of the TO 89 SOW issued on 1 May 2005 stated: "Contractor Force Protection. The Government will provide for the force protection and security of contractor personnel in convoys and on site, commensurate with the threat, and [in accordance with] the applicable Theater Anti-Terrorism/Force Protection guidelines." (R4, tab 5 at 1, 16)

<u>The Need for PSCs to Supplement Government Force Protection
for Government Contractors and Subcontractors in Iraq</u>

14. On 27 June 2003, a KBRS employee was shot and injured while traveling in a motor vehicle convoy in southern Iraq. By email of the same date, the KBRS contracts manager (Ms. Mary Wade) told the lead Rock Island procurement contracting officer (PCO) for Contract 0007 (Ms. Mary Beth Watkins)[2] that:

> This incident underscores the threat to U.S. personnel identified in the...classified message that informed cleared KBR personnel that movement along the MSR [Main Supply Route] in IRAQ, particularly during the next 72 hrs, poses a significant risk to both personnel and materiel for all US personnel.
>
> As a result of this incident as well as the threat conditions identified in the message, safety and security considerations mandate that movement of KBR and subcontractor vehicle convoys be delayed until such time as the U.S. Government provides force protection assets adequate to the threat level.
>
> KBR is acutely aware that time is of the essence in providing food service support to V Corps, however, failure of the U.S. Government to provide adequate Force Protection in

---

[2] Ms. Watkins was the Rock Island lead PCO for Contract 0007 from the date of award (R4, tab 1 at 1) to October 2004 (tr. 5/142). During that period, she was never in Iraq (tr. 4/170).

8

accordance [with] the LOGCAP III Contract is impacting our ability to perform.

(Ex. A-23)

15. On 28 June 2003, a KBRS subcontractor's convoy was attacked with two drivers killed, four missing and six trucks destroyed. This incident was reported on 1 July 2003 by KBRS to the Rock Island PCO in an email chain which included the information that:

> 2. Military has decided to escort convoys but it appears it will take a little time to lash up the movement requirement, the convoys, and escort.
> 3. Some subcontractors have security, others do not. Main reason for no security is the inability to get permits to arm their security personnel.

(Ex. A-24 at 1, 2)

16. The Coalition Forces Land Component Command (CFLCC) was the military command responsible for the movement of logistical supplies from Kuwait into Iraq. The Deputy Commanding General of CFLCC from June 2003 to July 2004 was, Major General (MG) Stephen Speakes. At hearing, MG Speakes described the contractor convoy security situation in Iraq in June 2003 as follows:

> I had arrived in late June. It was obvious to me very quickly that we were taking new levels of threat to our supply and relief formations across Iraq, some situations more serious than others, and that we had to be very thoughtful about how we organized and supported convoys.
>
> And so early on what I asked our theater to do is to give a thoughtful examination to options. And the options that I outlined ranged the spectrum of capability. Most desirable, frankly, would be more combat support capability units be dedicated to the mission....
>
> The other thing I wanted to do is look at expanding our capability by missioning [sic] more units to provide the capability. And the other thing that I early on had said is let's

look at the potential for some form of the hired contractual capability.

(Tr. 8/8, 49-50)

17. On 3 July 2003, the KBRS contract manager (Ms. Wade) notified the Rock Island PCO (Ms. Watkins) that over 1,000 trucks were awaiting convoy support into Iraq at the NAVISTAR staging area in Kuwait. The message described the materials being transported and concluded that if not delivered, "the other missions that are dependent on the Truck Driver providing the transportation will come to a screeching halt and the Client as well as KBR, will be in jeopardy of mission failure." (Ex. A-27)

18. The Rock Island PCO referred this message to the Rock Island operations personnel with the comment that: "The lack of required force protecting [sic] is having direct mission impact and needs resolution soonest. The contractor will have grounds for government caused delay, but more importantly the mission needs of the warfighter are in jeopardy of not being met. Request theater assistance to resolve." At hearing, Ms. Watkins testified that up until the time she left the contract as PCO in the fall of 2004, "there were continued force protection issues." (Ex. A-27; tr. 4/199-201, 204)

19. On 9 July 2003, KBRS met with MG Speakes and reported that the personnel and equipment casualties from attacks on its convoys and those of its subcontractors from mid-May to date were 7 killed, 7 wounded, 4 missing and 10 trucks missing. MG Speakes noted, among other things that: "Tomorrow the government will provide convoy protection for 46% of the convoys waiting to travel north. This level of support must increase, but presently the government is short convoy escort vehicles and shooters (shotgun riders)." The parties discussed KBRS contracting for private security, and agreed that "LOGCAP Planners will develop a revised statement of work requesting contracted security." (Ex. A-29 at 1, 3)

20. On 19 September 2003, MG Speakes sent the following message and formal request to the Rock Island Commander with copies to, among others, the Deputy Commanding General and senior logistics staff officer of CJTF-7:[3]

> Subject: CFLCC Request for Help with LOGCAP Contractor Convoy Security.

---

[3] Combined Joint Task Force-7 (CJTF-7) was the initial designation of the coalition military forces in Iraq (tr. 5/188-89). On 15 May 2004, the designation was changed to Multi National Force-Iraq (MNF-I) (ex. G-173). CJTF-7 and MNF-I reported to the Theater Commander, CENTCOM (tr. 8/17).

[I]n message below we request your help in solving one of our most vexing problems, specifically convoy security for contracted operations in Iraq....[W]e see no other optoin [sic] but to ask that the current contract provisoins [sic] be amended to support operations in Iraq. We appreciate your support and hope that this is a request that is supportable....

....

MEMORANDUM FOR Commander, Army Field Support Command. Rock Island, Il 61299

SUBJECT: Adequate Force Protection for the Logistics Civil Augmentation Program (LOGCAP) Convoys in Kuwait and Iraq

1. Request Army Field Support Command (AFSC) review the basic LOGCAP contract and provide a contractual recommendation allowing Kellogg Brown & Root (KBR) the authorization to pursue a civilian transport and transportation security company to conduct convoy escorts missions for the execution of convoys in Iraq during the movement of government materiel on theater supply routes. The current force protection posture, pending reductions in force structure, present and future demands for military police forces, all support the need to explore options other than military escorts in order to conduct secure and unhindered convoy operations.

2. The LOGCAP Basic contract and Statements of Work (SOW) needs to be modified to allow for KBR to provide contract security for their convoys moving government materiel on theater supply routes in Kuwait and Iraq. This change to authorization and utilization of contracted security should be in compliance with US Federal and Military Regulations that established the current base contract.

3. The contract should be administered by KBR or its subcontractor, with standards and operating procedures in accordance with the senior military police organization in theater. The scope of operations or task execution plan will be developed by KBR and accepted through the appropriate contracting and command channels.

4. We understand that there will be legal and perception concerns in the use of contracted security, but with pending reductions in force structure, present and future demands on contractor support, we must ensure unimpeded flow of supplies. We believe this is a viable course of action.

(Ex. A-41 at 3-5)

21. MG Speakes expected that Rock Island would prepare a proposal for contract modification that he could submit for approval by the CJTF-7 combat commander in Iraq and the Theater Commander at CENTCOM. However, he testified: "Despite my repeated efforts, to my knowledge I never got a formal proposal back, and I never was able to take anything and formally bring it up to a higher staff to ask for their help." (Tr. 8/55-56)

22. On 26 September 2003, CJTF-7 Fragmentary Operations Order (FRAGO) 889 described the current convoy security situation in pertinent part as follows:

BA'ATH PARTY SECURITY FORCE ELEMENTS, RELIGIOUS EXTREMISTS/FOREIGN TERRORISTS, AND CRIMINAL ELEMENTS CONTINUE TO ATTACK INDIVIDUAL OR SQUAD-SIZED UNITS WITH SMALL ARMS, RPGS, OR SNIPER FIRE AGAINST CONVOYS AND CRITICAL NODES IN THE CJTF-7 AOR. THERE CONTINUES TO BE NUMEROUS ATTACKS ALONG MSR TAMPA BETWEEN CSC NAVISTAR AND LSA ANACONDA.... IT IS ASSESSED THAT THESE SMALL GROUPS...OF ARMED INDIVIDUALS WILL CONTINUE TO EMERGE. ATTACKS WILL CONTINUE DUE TO THE ACCESSIBILITY OF WEAPONS AND ABSENCE OF MILITARY PRESENCE IN THE SMALLER OUTLYING TOWNS.

(Ex. A-44 at 1)

23. On 24 November 2003, the commander of the Defense Contract Management Agency (DCMA) activity in Kuwait, CDR Kent Caldwell, USN, sent a message to the CFLCC 143rd Transportation Command. The message cited the conflicting standards in operation orders (OPORDS) issued by CFLCC and CJTF-7 for convoy protection, and further stated in pertinent part:

As convoy security is contractually required to be provided by the government and be consistent with the standards set for all DOD civilians, I believe the government is faced with an unexecutable task. As I understand it, they are no longer resourced to comply with either standard, especially when you consider that contractors cannot carry weapons. Their need for external security is greater [than] that of armed soldiers moving in military convoys for which the majority of the guidance found in both OPORD's applies.

....

While I understand and appreciate the resource restrictions on both soldiers and government equipment to perform the missions assumed by KBR under the LOGCAP III contract, the Army has entered into a contract with KBR and is apparently unable to provide the requisite security and protection requirements established by either CFLCC or CJTF-7. If uncorrected this will significantly impact the fuel, line haul, mail, and Class 1 transportation mission areas supported under this contract.

(Ex. A-56 at 2)

24. On 19 December 2003, CJTF-7 FRAGO 1242, (KBR Convoy Security Procedures) stated in relevant part:

ATTACKS AGAINST KELLOGG, BROWN AND ROOT (KBR) CONVOYS HAVE DRAMATICALLY INCREASED DURING THE MONTHS OF OCTOBER AND NOVEMBER. BASED UPON INTELLIGENCE ESTIMATES, THE THREAT OF FUTURE ATTACKS AGAINST KBR CONVOYS IS PROJECTED TO INCREASE DURING THE MONTHS OF DECEMBER 2003 THROUGH APRIL 2004....SINCE THE BEGINNING OF OCTOBER, TH[E] MAJORITY OF ATTACKS AGAINST KBR CONVOYS HAVE BEEN THE RESULT OF IEDS AND SMALL ARMS FIRE. NINETY PERCENT OF ALL ATTACKS DIRECTED SPECIFICALLY AGAINST KBR CONVOYS HAVE OCCURRED ON MSR TAMPA. HOWEVER, SEGMENTS OF ASR JACKSON, MSR MICHIGAN, MSR MILTON AND MSR MOBILE REMAIN EXTREMELY DANGEROUS TO KBR

CONVOYS. KBR CONVOYS REMAIN EXTREMELY VULNERABLE TO ATTACKS AT REST STOPS, REFUEL POINTS, TRAFFIC CHOKE POINTS, LOCATIONS OF VEHICLE BREAKDOWNS, HAND-OFF POINTS FOR CONVOY SECURITY ESCORTS, MSC BOUNDARY LINES…AND MOVEMENT UNDER OVERHEAD PASSES.

(Ex. A-64 at 2)

25. On 31 December 2003, the Coalition Provisional Authority (CPA), the civil government of Iraq from 8 May 2003 to 30 June 2004,[4] recognized the need for and authorized the presence of private security companies in Iraq in its Order Number 3 (Revised) entitled "WEAPONS CONTROL." Section 3 of the order distinguished possession of firearms by "Private security firms" from possession of firearms by other "Groups" and "individuals" where it stated in pertinent part:

### Authorized Possession and Use of Firearms and Military Weapons

1) The following individuals are authorized to possess and use issued Firearms and Military Weapons…

   a) Coalition Forces,

   b) Iraqi security forces, and

   c) Groups and individuals who have been authorized to carry weapons in the course of their duties by the CPA or Commander, Coalition Forces or their duly authorized delegates.

2) Private security firms may be licensed by the Ministry of the Interior to possess and use licensed Firearms and Military Weapons…in the course of their duties, including in public places.

3) Individuals may be authorized to possess Firearms for personal use by obtaining authorization from the

---

[4] *See* United Nations Security Council Document S/2003/538 and Security Council Resolutions 1483 (2003) and 1546 (2004).

14

Ministry of Interior, as described in Section 5 of this
Order,

(Bd. ex. 2 at 2-3)

26. Lieutenant Colonel (LTC) Damon Walsh was the DCMA Northern Iraq Commander from August 2003 to January 2004 (tr. 13/106). By letter dated 14 December 2003, LTC Walsh told KBRS that CJTF-7 was considering options "for enhancing the protection of convoys and commercial traffic throughout Iraq" and requested KBRS to provide an outline of the conditions and procedures that should be in place for the government to issue weapons and ammunition to KBRS employees (ex. A-65 at 2).

27. By letter dated 26 January 2004 addressed to the Rock Island PCO (Ms. Watkins), KBRS replied to the 14 December 2003 request. The substance of the reply was that:

> KBR has made the decision that the arming of truck drivers as a means of self defense to mitigate the dangers facing these personnel as they travel the roads of Iraq, is not a viable option. However, we do offer an alternative for convoy escort security that would free up the military assets currently utilized in this mission and enable them to focus on their core mission of providing route security.
>
> With the issuance of indemnification for KBR, and acceptance of the concept of operations (att. a) KBR stands ready to subcontract out the armed convoy escort for those trucks *under KBR LOGCAP responsibility and control* across the Major Supply Routes of Iraq.

(Ex. A-74 at 8241)

28. At hearing Ms. Watkins could not recall sending a written reply to the KBRS 26 January 2004 proposal, but testified that "We discussed and verbally it was communicated back to KBR that we were not inclined to indemnify" (tr. 4/213-14).

29. At hearing, LTC Walsh testified that he interpreted the contract as requiring the government to provide the force protection and that KBRS "could not charge the government for armed security as the contract stood at that time." However, he also testified that: "There was nothing [in the contract or task orders] that specifically said thou shalt not use private security companies." (Tr. 13/114) Moreover, when asked whether he thought the use of PSCs should have been allowed, he testified:

15

A. Yeah, absolutely.

Q. Why?

A. Because it was a dangerous place, and I mean I was pretty unequivocal from the word go, that I thought a better approach to providing security would have been for the contractor to be able to either acquire protection through one of the, you know, we had an army of private contractors running around Iraq....

[Q.] Private security contractors?

[A.] Yes....

A. You couldn't swing a dead cat without knocking down half a dozen guys walking around with M4s....[T]o answer your question, yes, absolutely I thought that KBR should have been able to do that.

(Tr. 13/175-76)

30. On 22 February 2004, the KBRS Deputy Area Manager for V Corps North sent the following message to the troop unit that was responsible for force protection in that area:

> For your information the military has failed to comply with providing escort requirements. Time and time again we have sent emails after emails and made phone calls after phone calls to get this escort requirement taken care of. As you know last week a convoy was arranged for four (4) trucks and they were abandoned while in route because of the speed of travel. I would like to point out this same subcontractor had employees shot in a drive by shooting yesterday around B3, so they are a marked target.
>
> It was also briefed on the last [meeting with the government] that [the government] would prefer to have at least nine (9) to ten (10) trucks in a convoy. We consulted with our subcontractor and they hired additional trucks for a total of ten (10) trucks which are loaded and ready to go, when request for convoy was acquired today, KBR was told [the

16

government] was not able to provide the escorts due to lack of assets and would not have the assets for two to three weeks if then. This has directly affected our ability to carry out our tasked assigned to KBR by CJTF7, plus is causing the subcontractor to occur [sic] unexpected costs.

(Ex. A-80 at 2)

31. The government answer to KBRS' 22 February 2004 message was that: (i) "these combat units were sent here to fight the war, not do escorts for KBR ONLY"; (ii) the tasking placed on the troop unit responsible for providing the force protection was "enormous"; and (iii) when the troop unit was ready to resume escort duty, "I will let you...know" (ex. A-80 at 1).

32. On 12 April 2004, CJTF-7 FRAGO 622 described the current convoy security situation as follows:

THE ENEMY IS PROSECUTING A DELIBERATE OPERATION TO INTERDICT OUR LINES OF COMMUNICATION (LOC). WITH THE SIMULTANEOUS ATTACKS ON SIX OVERPASSES ON 10-12 APRIL 04, IT IS APPARENT THE ENEMY HAS TAKEN HIS CAMPAIGN BEYOND HARASSMENT THROUGH DIRECT ACTION TO A DELIBERATE EFFORT FOCUSED ON THEATER LOC INTERDICTION.

CURRENT SITUATION. ALONG MSRS LEADING INTO AND OUT OF BAGHDAD THERE HAVE BEEN 66 ATTACKS IN THE LAST WEEK, 49 ATTACKS ONE WEEK AGO, AND 50 TWO WEEKS AGO. THERE HAVE BEEN 3 COMPLEX ATTACKS/AMBUSHES IN LAST THREE DAYS RESULTING IN THE DESTRUCTION OF A REFUELING CONVOY...DESTRUCTION OF 4 OVERPASSES...AND THE AMBUSH OF A CONVOY....THE MSRS BETWEEN 1) BAGHDAD AND BALLAD, 2) BAGHDAD AND KARBALA, AND 3) BAGHDAD AND FALLUJAH ARE EXTREMELY DANGEROUS AND CONTINUE TO BE HIGHLY SUSCEPTIBLE TO THREAT ACTIVITY RANGING FROM IEDS TO SMALL ARMS AND RPG ATTACKS/AMBUSHES.

CURRENT ASSESSMENT: ATTACKS ARE MUCH HIGHER THIS WEEK AND UPWARD TREND IS LIKELY TO CONTINUE AS A RESULT OF THE CONTINUED

SADR/MAHDI MILITIA UNREST, AND OPERATIONS
AGAINST THREAT FORCES IN WESTERN IRAQ.

(Ex. A-96 at 2)

33. On 14 April 2004, the DCMA administrative contracting officer (ACO) for
TO 59 (MAJ Hills) reported to the Commander, DCMA Northern Iraq (LTC Blaine) the
following:

> All indications are that the government has failed to live up to
> its contractual obligation to provide Force Protection (FP) to
> the TTM convoys (TO0059). Given that, KBR is currently
> not required to run most (if any) convoy routes. They did run
> three convoys to Anaconda today. Only one made it. The
> other two got lost. They are now at an FOB. KBR may not
> run any convoys tomorrow if the government does not
> improve its track record on FP. The same MP escorts that got
> them lost are to bring the two convoys in to Anaconda
> tomorrow. The best I can tell at this time is that they have
> never ran the route they are about to set out on. Based on my
> discussions with TTM's PM...I went over and talked to the
> 13th COSCOM CC ...I told him of KBR's concerns. I feel
> contractually the government is not living up to its contractual
> obligations. [The COSCOM Commander] stated that
> COSCOM was doing their part by providing a soldier for
> every third truck. He said it was the 15th MP's that were
> providing the escort not COSCOM and that the issue of
> getting lost was...not a FP issue "...they are all safe aren't
> they." I just want to go on record that absent any new
> information from the government, I concur with KBR in that
> the government is not providing FP commensurate with the
> threat. If they choose not to run tomorrow I would be hard
> pressed to disagree with them. Oh by the way, one of the
> trucks in one of the lost convoys got destroyed by an IED.

(Ex. A-98 at 2-3)

34. On 26 June 2004, CPA Memorandum Number 17 entitled "REGISTRATION
REQUIREMENTS FOR PRIVATE SECURITY COMPANIES (PSC)" was issued to
"establish a mechanism whereby all PSC will be registered, regulated and vetted and to
update Iraqi law as it relates to PSC." The memorandum set forth detailed requirements
and procedures for licensing, use of force, code of conduct, etc. (Ex. G-189) As of

18

25 November 2006, more than 100 PSCs were registered or in the process of being registered with the Iraq Ministry of Interior (MOI) (ex. A-154).

35. Lieutenant General (LTG) Ricardo Sanchez was the commanding general of CJTF-7 and its successor MNF-I from 14 June 2003 to 4 July 2004 (tr. 5/163, 203). When asked at hearing if he had any comment on reports in the press that the Army Chief of Staff (General Shinseki) had advised Congress and the President that it would take 200,000 men to occupy Iraq, LTG Sanchez testified:

> He was about right. And as you'll see from the end of my description here, it was, as a nation, America did not have sufficient capacity to accomplish the tasks that were assigned to the force that was on the ground during that time frame.

(Tr. 5/175-76) When asked whether he had the resources to provide the same level of force protection to KBRS as was provided to the civilians in the CPA he replied: "clearly not, clearly not" (tr. 6/40).

36. When asked whether there were any areas in Iraq where it would have been acceptable to travel without armed escorts, LTG Sanchez testified:

> [F]rom the very beginning we established a requirement that there was an absolute minimum...standard of force protection. We never wavered from that. There was never any segment of the country where we said this is benign enough, or it's peace time, completely peace time and there is not [sic] threat of attack. No, we never did that.

(Tr. 6/102-03)

37. With respect to the origin of the need for PSCs in the occupation of Iraq, LTG Sanchez testified:

> [T]he key factor is that DOD [Department of Defense] does not have the military capacity to secure all of the missions Ambassador Bremer has.[5] It's a massive requirement, and...the numbers of forces that we have on the ground and the tremendous challenge that the country has to sustain that requirement over time. It's just not there.
>
> ....

---

5 Ambassador Bremer was the Administrator of the CPA.

19

...[B]ecause of the analysis that we have done in the...fall and early winter of 2003, we very clearly established, unequivocally established within the command that the capacity of the force, the quantity of the force, and the demands of the mission both from a war fighting perspective and the growing requirement that we foresaw coming from the reconstruction mission, that we were not going to be able to continue to support that without private security. And then that discussion really got started in earnest to integrate private security companies under government/military contracts....

(Tr. 6/22, 67)

38. LTG Sanchez estimated that there were at least 10 and possibly 20 PSCs operating in Iraq in March 2004 (tr. 6/25). Moreover, their presence in the battle space was not merely tolerated, it was welcomed by the combat troop commanders. LTG Sanchez testified:

We allow them to come in, and we encourage them to come in at the different levels of command to get situational awareness briefings, to brief them on what is available for them in the event that they get into a situation that they can't handle. We have quick reaction forces that are in every sector that can respond to an incident on the major routes that they're operating in.

. . . .

...[I]f a private security entity or a contractor came to a battalion commander or a brigade commander and asked to move with private security, I'm absolutely sure that that young commander would have said be my guest. You know, that's necessary to accomplish your mission of feeding my fellow battalion across the street, go ahead and do it.

We were not concerned with...and commanders at that level were definitely not concerned with going up to the next higher headquarters to brigade or division and say hey, can I move this? What they were trying to do was actually get the mission done, and the reality of the complexity and the

20

density, and the demand that was on the ground at that time was basically for them to get the mission done.

And this was not just in moving a box of tomatoes, it was across the board....[T]he demands that we were placing on these young commanders was massive. We were asking them to fight, we were asking them to set up local governments, local schools. The last thing that they want to be doing was diverting their combat power to those kinds of missions, so if they saw the opportunity they – clearly, in my mind, they would have taken it. And I would not have objected to that if that had happened, and not had been told about it.

(Tr. 6/24-25, 35-36)

39. On 30 June 2004 the CPA was terminated and the Interim Iraq Government (IIG) was established as the civil government of Iraq (ex. A-113). On 4 July 2004 CENTCOM issued a Warning Order (WARNORD) entitled "CONTRACTOR RISK MITIGATION" which stated in pertinent part:

THIS IS A WARNING ORDER (WARNORD). REQUEST COMMANDER, MNF-I, IN COORDINATION WITH CHIEF OF MISSION (COM) AND INTERIM IRAQ GOVERNMENT (IIG), DEVELOP COMMANDERS ESTIMATE AND COURSES OF ACTION (COAS) FOR USG CONTRACTOR RISK MITIGATION IN IRAQ. PROVIDE ESTIMATE WITH COAS TO CENTCOM NLT 13 JULY 2004....SITUATION. 1.A. A MAJOR USG CONTRACTOR IN IRAQ IS CONSIDERING SUSPENDING OPERATIONS DUE TO CONCERNS OVER THE SECURITY ENVIRONMENT IN IRAQ. THE SUCCESS OF US EFFORTS IN IRAQ DEPENDS IN PART ON THE ABILITY TO RETAIN AND MANAGE CONTRACTORS FOR SERVICES, PROTECTION AND CONSTRUCTION. TO DATE, COMMNF-I HAS NOT PROVIDED PROTECTION FOR CONTRACTORS, AS CONTRACTOR SECURITY IS NOT A SPECIFIED MILITARY MISSION. CONTRACTORS ARE PRIMARILY RESPONSIBLE FOR THEIR OWN SECURITY, AND CONTRACTOR SELF-PROTECTION WAS ASSUMED TO CONTINUE BEYOND THE 30 JUNE TRANSFER OF POWER. UNSCR 1546 AND THE

21

ANNEXED LETTER BY IRAQ PRIME MINISTER ALLAWI GIVE THE MULTI-NATIONAL FORCES THE MANDATE TO CONTRIBUTE TO THE MAINTENANCE OF A SECURE AND STABLE ENVIRONMENT IN IRAQ. THIS INCLUDES THE AUTHORITY TO DEFEND USG CONTRACTORS. 1.B. GIVEN THE CURRENT SECURITY ENVIRONMENT IN IRAQ, ALL USG AGENCIES MUST COORDINATE PROTECTION OF USG CONTRACTORS THROUGH A COMBINATION OF COALITION MILITARY FORCES, IRAQ SECURITY FORCES AND PRIVATE SECURITY COMPANIES. CONTRACTORS CONTINUE TO HAVE THEIR RIGHT OF SELF DEFENSE AND MAY, IN SOME CIRCUMSTANCES, ARRANGE FOR CONTRACTOR SECURITY THROUGH A SUBCONTRACT WITH A PRIVATE SECURITY COMPANY.

(*Id.*)

40. From 14 March to 21 September 2004, there were 15 reported attacks on KBRS subcontractor employees and vehicles at LOGCAP headquarters in Baghdad and 5 of the "B" worksites. In these attacks, 5 employees were killed, 1 beaten, and 25 were missing or held captive. (Ex. G-232 at 5-9)

41. From June through November 2004, LTC Sean O'Day was Commander, DCMA Northern Iraq, responsible for overseeing KBRS' performance of TO 59 in northern and western Iraq (tr. 12/8). On 29 August 2004, KBRS notified LTC O'Day and others that a subcontractor convoy escorted by an Iraqi private security company had been ambushed and three trucks were missing. LTC O'Day answered the notification with the following remark: "The question may come back why were these guys using a private security detail instead of military escorts." (Ex. A-126 at 2, 4) At hearing, LTC O'Day testified:

Security was always a big issue....

...It was that security thing that always held them [KBRS] up on bringing stuff in....

....

[T]here weren't enough military forces in Iraq to do everything that had to be done and convoy security for contractors as well as security for somebody like me to get

22

around because I didn't have a combat force that was at my beckon [sic] call to take me around Iraq.

(Tr. 12/32-33)

42. On 31 December 2004, the Multi National Corps-Iraq (MNC-I), the tactical troop command under the MNF-I, issued a FRAGO, "SUBJECT: TACTICS, TECHNIQUES AND PROCEDURES (TTP) TO REDUCE VEHICLE MOVEMENT FRATRICIDE." Paragraph 1.A. of this order recognized the presence and usefulness of the PSCs in accomplishing the coalition mission in Iraq as follows:

> THERE ARE APPROXIMATELY 30,000 PRIVATE
> SECURITY CONTRACTORS (PSCS) IN ADDITION TO
> MILITARY AND DOD PERSONNEL IN IRAQ
> PERFORMING SECURITY DUTIES IN SUPPORT OF
> MNFI, DEPARTMENT OF STATE (DOS),
> INTERNATIONAL DIPLOMATIC MISSIONS, AND
> OTHER OPERATIONS VITAL TO THE FUTURE OF
> IRAQ. THEIR MISSIONS INCLUDE SECURING KEY
> COALITION PERSONNEL AND CRITICAL MATERIALS.

(Ex. A-139 at 1)

43. On 22 April 2005 the award fee determining official issued his determination of the award fee for KBRS' performance of TO 59 from 13 June 2003 to 31 January 2005. The overall performance rating was excellent. The determining official noted the arduous circumstances under which the task order was performed, including among others, "the attacks on and hijacking of your convoys" and "a lack of force protection to escort convoys with needed materials." (Ex. A-144 at 1-3)

44. LTC Scott Sheridan succeeded LTC O'Day as Commander DCMA North from November 2004 to May 2005 (tr. 12/121-22, 124). At a KBRS briefing in December 2004, LTC Sheridan was told that 64 KBRS direct hires and subcontractor employees had been killed in hostile action (tr. 12/164).

45. On 23 April 2005, LTC Sheridan presented a briefing on the award fee determination decision for KBRS' performance of TO 59 for the period 1 February to 30 April 2005. The briefing slides included one for "Special Considerations" with two major bullet points—"Operating in a non-permissive environment" and "Availability of escorts." Two of the sub-bullets under non-permissive environment were "Loss of material—Hijacked, destroyed," and "Loss of employees, due to death/fear of losing life." (Ex. G-276 at 5) At hearing, when asked whether at any time during his tour of

23

duty in Iraq convoys were not attacked for some prolonged period of time, LTC Sheridan answered "I don't believe that ever happened while I was there" (tr. 12/167).

## KBRS Prime Contractor Use of PSCs on Contract 0007

46. From late January 2004 to 1 April 2005, Mr. Craig Peterson was the KBRS Program General Manager for Contract 0007 activities in the CENTCOM area which encompassed 23 different countries. For the first four months in 2004, he stationed himself in Iraq. (Tr. 6/123, 125, 129) At hearing, Mr. Peterson testified that his policy in Iraq was not to use private security on Contract 0007 "because the Army was supposed to provide our protection. And if we went willy-nilly off and decided to do our own, then, I probably wouldn't have…a good leg to stand on when arguing with the Army to provide the force protection." Mr. Peterson's view was based on the fact that the contract said that force protection would be provided by the Army and not because he thought the contract prohibited the use of PSCs. (Tr. 6/185-87)

47. After Mr. Peterson left Iraq, the senior personnel he hired to manage the KBRS activities in Iraq did use PSCs for their movements, and this was known by both the DCMA Commander Iraq and the Rock Island PCO in 2004. Colonel (COL) Ainsworth Mills, the DCMA Commander Iraq from April through October 2004, testified that:

> Yes, I knew that there was a private security guard contract to use for the senior managers that were in Iraq to move around. And it was done because they felt that they needed to have that flexibility to move. And that time and time again we talked about that. It was that that was not an allowable cost under the LOGCAP contract and that that would have to be something that LOGCAP would pay for. I'm sorry. That would be something that KBR would have to pay for, but that LOGCAP would not pay for that.
>
> And I had discussions with Mary Beth Watkins the PCO, about that. And the people who worked for me also we had several discussions about that that was not an allowable cost of the LOGCAP contract. And I did relay that to Mary Wade, Reno Butler and to Paul Cerjan [of KBRS].

(Tr. 11/88, 131)

48. In its post-hearing brief, the government states that "Had Ms. Watkins been advised of KBRS' noncompliance, there is no question that she would have stopped it" (gov't br. at 128). COL Mills' testimony is that she was so advised (*see* finding 47).

24

The parties have not pointed to anything in the record and we have found none indicating that Ms. Watkins did anything to stop the alleged noncompliance when so advised by COL Mills.

### Subcontractor Use of PSCs on Contract 0007-ESS

49. Although the KBRS manager Mr. Peterson testified that he did not use private security for himself while he was in Iraq, he knew that KBRS subcontractors on Contract 0007 were using PSCs and he did not object to their use. His testimony on this point was as follows:

> Q. ...[D]id you know that KBR's subcontractors were using private security contractors under LOGCAP at the time you were there?
>
> A. Well, I'd say yes. I meant, they had to. I mean, they were dying off like flies. We had a hard time keeping subcontractors.
>
> Q. I mean, any specific knowledge of KBR's subcontractors using PSCs, or is it just an inference?
>
> A. ...We were given some very untenable missions and untenable timing....If they were not using PSCs, I have no idea how they did their job. None whatsoever. Because they couldn't have gone anywhere.
>
> ....
>
> So I can't point to me talking to a sub and say "Tell me about your subcontract with a PSC." That didn't happen....But I knew in my own mind that they had to be using them, or they couldn't have performed.

(Tr. 6/193-94)

50. As to the availability of military convoys for subcontractor travel between sites within Iraq, Mr. Peterson testified:

> I myself, as the head [of LOGCAP] and a retired general officer, would be on an installation and ask the young lieutenant or captain who has got a convoy going to Arifjan or somewhere if I could pile in. They said, "I don't do

contractors." I said, "I'm Craig Peterson. I'm in charge of LOGCAP." They said, "I don't do contractors."

Q. They didn't say, "Who?"

A. No....So, I mean, it -- if I got kicked out of convoys, then there is no doubt in my mind that subs did.

(Tr. 6/194-95)

51. The principal KBRS subcontractor on Contract 0007 involved in these appeals was ESS Support Services Worldwide (ESS). The ESS subcontracts under Contract 0007 were for the installation and operation of troop dining facilities (DFACs) at specified sites in Iraq (app. supp. R4, tab 2). ESS had the largest PSC costs ($19,234,932) of the 21 subcontractors whose estimated PSC billings for the period 2003 through 2006 are in evidence (R4, tab 58 at 5-6, 8-9). ESS concluded its subcontract operations in Iraq on 30 June 2006 (tr. 8/159).

52. The ESS operations manager in Iraq from June 2003 through June 2006 was Mr. Steven Murray (tr. 8/94, 159). Mr. Murray testified that ESS used PSCs for the entire period of its engagement in Iraq because the government force protection did not cover all of its security requirements. This testimony in pertinent part was as follows:

> [W]e pretty consistently used, from early '03 and all the way through our departure in '06, PSD [private security detachment] teams to move people and money and equipment in and out of the country, because again, even in '05 and '06, the [government] convoy system would not let our NTVs [non-tactical vehicles] in the convoy. If you disclosed you're carrying cash, you're not getting in the convoy with cash, and it was a total cash economy the whole time we were there.
>
> ....
>
> ...It became extremely difficult to move things between sites. We'd approach – we tried to use some military force protection on the site, and I personally talked to two or three commanders about this. We were told pretty consistently that the military is not there to babysit contractors.
>
> ....

I had some people...stuck on a southern site, and I needed to move them to a northern site. [They were included in a government convoy but] halfway through Baghdad, they stopped our vehicle...[S]aid they got a call to go on a mission and they took off in another direction....[W]e dispatched, enormous cost,...a PSD team to go and pick them up.

....

...Another occasion happened whereby we were moving equipment...we had two or three large 500 kV generators...at one site; we had to move them across Baghdad to another site. They [the government] agreed to move us.

...Halfway there, they told our truck to pull over and wait. They had to leave, and they left. Never saw my truck again. It was just gone. The driver,...I don't know what happened to him. The truck was gone.

We learned our lesson very quick. We did ask, from time to time, and most times it was "We're not doing that. We can't do that. We're warfighters. Take care of yourselves." It's extremely difficult to move between sites, and it was a pretty regular need of ours to do that....

Money, people, sometimes food.... [We] only carried two or three days' worth of food [at each dining facility site]. So if you don't have a delivery coming in every third day, you're in trouble. You can't feed soldiers. That was unacceptable to us, as a caterer, and to our client, KBR. We could not fail.

So we had to move food, and the military would not touch it from intra-theater. They had bigger things to do than to move contractors.

Q: Did there ever come a time when you simply gave up on seeking force protection?

A. Honestly, no. It was in our interest. I mean this is a business, and if I didn't have to pay a PSD team, which were not cheap, and I could get it in a convoy, I'd rather use a convoy. It didn't always fit with our business unfortunately.

27

Either you didn't have the time to do it, or they wouldn't do it. But always, even up until middle of June of 2006, when we were leaving, we tried to use convoys as much as we could. It's a cost saver for us. So but the answer is yes. We never gave up trying to do that.

(Tr. 8/152, 154-58)

53. In January 2006, ESS began demobilization activities for the conclusion of its Iraq contracts in June 2006. The extent of the government force protection and ESS' use of PSCs during this period was described by Mr. Murray as follows:

> We started demobilizing contracts in January of 2006. We dropped a few of the Charlie sites in January, and all of the rest of our sites, seven or eight of them that were left, came to full term in June 2006.
>
> A couple of things happened in '06 when we ended our contracts. In some instances, the FOB [Forward Operating Base] was closing, going away, and we'd have to relocate. KBR would tell us move all of this stuff from this FOB to th[i]s FOB. There was no force protection for that. The military was leaving. They were either gone or on their way, and that brings up a point about static security as well.
>
> In those situations, two or three instances where the static security went away. The gates were gone. There's now an open installation, and we had people and assets on the ground. So we would put PSD teams on the ground, to keep us safe, and to move whatever it is that we had to move from A to B, either excess food or reefers.
>
> ....
>
> Q. Did you get any force protection for any of that demob operation?
>
> A. Unfortunately, we asked several times. On the demobing again, these military units were now departing. They were leaving, either going to another FOB or retrograding back to Kuwait or back to the U.S. We had no

force protection. There were times when the perimeter came down, the gates were open.

All the military were leaving, and we had to put, at our cost again, these PSD teams on site, one to protect our little compound. Of course, we shrunk the perimeter down to protecting our tent, and then as we took things down, loaded them up and transported them across the country to other sites,...there was no security for us there at all.

No force protection, no kind of war structure. We used our own, our own guns to move those things across country.

(Tr. 8/158-60)

54. For reasons of expediency in meeting the logistical requirements of the troops, most if not all of the KBRS subcontracts at issue in these appeals, including the ESS subcontract, were awarded on a negotiated fixed-price basis (tr. 15/83-84). Asked at hearing if ESS "made or lost money on your use of PSCs," Mr. Murray testified:

Our use of private security, unequivocably [sic] was a losing proposition for us. We incurred more costs than we charged ...KBR for....[W]e had to estimate our usage when we're putting in a firm fixed price contract. We estimate what we're going to use.

You know, the world changed on us, and we didn't have the ability to go back and change our price. Aside from the escalation of use, the escalation of the cost increased as well. The PSD team, instead of 750 now was $4,000 [per mission].

(Tr. 8/168-69)

55. The government states in its post-hearing reply brief that "Mr. Murray is not a credible witness....Mr. Murray's sworn testimony is that the military did not move food...(Tr. 8/111). Yet the right-hand columns of the NAVISTAR convoy matrices prove that the military moved food every day, proving Mr. Murray to be a liar."(Gov't reply br. at 18-19) We have carefully examined government counsel's accusation of perjury regarding the movement of food, and find it entirely without merit. There is no testimony by the witness on the cited transcript page that "the military did not move food." To the contrary, the witness's testimony on the two preceding pages regarding the military's daily priorities for NAVISTAR convoys from Kuwait into Iraq was that "Some

29

days we could move construction materials, or Class 1, which is food. We could move food most times. That was what we did." (Tr. 8/109-10) Mr. Murray's testimony regarding the military not moving food was in the context of movements of food by ESS between the dining facilities within Iraq when a dining facility had a shortage of food (tr. 8/157). The "NAVISTAR convoy matrices" cited by the government show only the movement of food on convoys from NAVISTAR on the Iraq/Kuwait border into Iraq. They do not show and do not purport to show the movement of food originating at one base in Iraq and delivered to another base in Iraq. (Exs. A-85, -115)

56. The overall performance of the task order food service requirement by KBRS and its food service subcontractors was succinctly summarized by the testimony of two government witnesses. MG Speakes, the Deputy Commanding General of CFLCC from June 2003 to July 2004 testified that he made unannounced visits and ate at the KBRS subcontractor DFACs "all the time" and found the meals "extraordinary....Great. Fantastic" (tr. 8/8, 86). LTC O'Day, the DCMA Northern Iraq Commander from June through November 2004 testified that he ate "Every day, three times a day" at an ESS DFAC and the food was: "Outstanding. Over the board." (Tr. 12/8, 115-16)

57. The KBRS coordinator for all subcontractor movements of materials and equipment by truck from Kuwait into Iraq from mid-July 2003 until "sometime" in 2005 at the U.S. Army NAVISTAR facility was Ms. Leslie Smith (tr. 7/10-11). Ms. Smith testified that throughout that period all movements across the border had to be submitted to and approved by the U.S. Army Movement Control Battalion (MCB). The primary method of movement was in a military escorted convoy. However, if a place in a military escorted convoy was not available, or if the subcontractor otherwise requested to move with its own security, the MCB routinely granted the request. When a subcontractor was planning to move trucks with its own security, it was expressly so stated on the KBRS MP Escort Allocation Request submitted daily to the MCB. (Tr. 7/11, 34-40, 42-53; ex. A-85 at 2, exs. A-86, -115)

58. On 24 March 2004, Ms. Smith sent a memorandum on border crossings into Iraq to MAJ Grady Sessoms, her designated point of contact at the MCB. The memorandum stated among other things that "Private Security is allowed. Iraqi security escorts wait in Iraq to hook up with their convoy." (Ex. A-86) At hearing Ms. Smith testified that she received no response from MAJ Sessoms then or at any other time telling her that use of private security for convoys into Iraq was not allowed (tr. 7/46-49).

59. LTG Jack Stultz was deployed in Kuwait and Iraq as Commander of the 143rd Transportation Command from October 2002 to August 2004 (tr. 14/8). He was at the third command level above the Movement Control Team (MCT) that was stationed at the NAVISTAR border crossing into Iraq (tr. 14/44). At hearing he testified that he had no knowledge of the use of PSCs at the border crossing described by Ms. Smith (tr. 14/48-49). However, we find the testimony of Ms. Smith and the contemporaneous

documentation in exhibits A-85, A-86 and A-115 persuasive as to the actual practice at the NAVISTAR border crossing. Moreover, we find that her 24 March 2004 memorandum sent to MAJ Sessoms (ex. A-86) was sufficient to put the government on notice that KBRS subcontractors were using PSCs for convoy protection after crossing the border into Iraq when government military escorts were not available.

60. The government was also on notice of the use of PSCs by KBRS subcontractors under Contract 0007 when on 10 June 2005, an ACO consented to the award of a food services subcontract with an express pricing justification in the consent documents stating that maintenance personnel would be moved by "Air transportation instead of land transportation...[and] then using the services of a professional security company to transport them to their respective sites" (app. supp. R4, tab 7 at 13307, 13312).

### Contract Modification No. P00012

61. Effective 27 November 2005, the parties entered into bilateral Modification No. P00012 to Contract 0007 (R4, tab 1 at 131). Among other things, this modification added the DFARS 252.225-7040, CONTRACTOR PERSONNEL SUPPORTING A FORCE DEPLOYED OUTSIDE THE UNITED STATES (JUN 2005) clause (hereinafter "the DFARS 7040 (JUN 2005) clause") to the contract (*id.* at 134). Section (j)(1) of the clause stated:

> (j) Weapons.
>
> (1) If the Contractor requests that its personnel performing in the theater of operations be authorized to carry weapons, the request shall be made through the Contracting Officer to the Combatant Commander. The Combatant Commander will determine whether to authorize in-theater contractor personnel to carry weapons and what weapons will be allowed.

(R4, tab 1 at 137-39)

62. The government contends that section (j)(1) of the DFARS 7040 clause required KBRS to obtain Theater Commander authorization for use of PSCs in performing Contract 0007 (gov't br. at 110-11). We find no reference to PSCs or contracts for security services in the DFARS 7040 (JUN 2005) clause that was added to Contract 0007 by Modification No. P00012. The DFARS 252.225-7040, CONTRACTOR PERSONNEL AUTHORIZED TO ACCOMPANY U.S. ARMED FORCES DEPLOYED OUTSIDE THE UNITED STATES (JUN 2006) clause at section (j)(1) does distinguish between arming contractor personnel and arming personnel under a contract or subcontract for security from a professional PSC and expressly applies the authorization requirement to both.

31

There is no evidence, however, that the 2006 version of the DFARS 7040 clause was incorporated by modification into Contract 0007 or the task orders thereunder at any time relevant to these appeals.

CENTCOM General Orders

63. Special Provision H-13 of Contract 0007 required among other things that "all personnel hired by or for the contractor will comply with all guidance, instructions and general orders...issued by the Theater Commander or his/her representative" (*see* finding 8). CENTCOM General Order No. 1A (GO-1A) dated 19 December 2000 was entitled: "Prohibited Activities for U.S. Department of Defense Personnel Present Within the United States Central Command (USCENTCOM) AOR." The stated purpose of the order was: "To identify conduct that is prejudicial to the maintenance of good order and discipline of all forces in the USCENTCOM AOR." Among the prohibitions in the order was paragraph 2.a. which stated: "Purchase, possession, use or sale of privately owned firearms, ammunition, explosives, or the introduction of these items into the USCENTCOM AOR." The order concluded with a waiver provision stating: "Authority to waive or modify the prohibitions of Paragraph 2 of this General Order is delegated to the Deputy Commander in Chief, USCENTCOM." (Bd. ex. 3)

64. From July 2003 to July 2007, Commander (CDR) Brian O'Donnell, USN, was the legal staff officer at CENTCOM responsible for reviewing applications for waiver of paragraph 2.a. in GO-1A. At hearing, CDR O'Donnell testified that there was nothing in GO-1A about contracted security (tr. 9/115). He further testified that, in August 2003, there were no theater written policies or procedures regarding contractors carrying arms and that: "In other words, there is no rule and therefore people are doing what they want" (tr. 9/53-55).

65. On 23 December 2005, CENTCOM issued for the first time a statement of policy, expressly stated to be considered a lawful general order, mandating CENTCOM authorization, on a case-by-case basis, for contractor use of PSCs in Iraq and Afghanistan. This policy/general order was addressed to about 60 Department of Defense and other government agencies, including the DCMA, but not to KBRS. The policy/general order stated in pertinent part:

> 2.c CONTRACT SECURITY ARMING AND USE OF PRIVATE SECURITY COMPANIES (PSC) IN IRAQ AND AFGHANISTAN.
>
> 2.c.1. THE DECISION TO ARM DOD CIVILIAN PERSONNEL, DOD CONTRACTOR EMPLOYEES OR AUTHORIZE THE USE OF CONTRACT SECURITY/PSC WITHIN IRAQ OR AFGHANISTAN TO PERFORM

32

SECURITY SERVICES SHALL BE DECIDED ON A
CASE-BY-CASE BASIS PER THE POLICY PROVIDED
HEREIN. ALL REQUESTS SHALL BE SUBMITTED TO
THE COGNIZANT US COMMANDER PER PARA 2.D.,
AND SHALL COMPLY WITH PARAGRAPH 3.F.
BELOW. A REQUIREMENT TO COMPLY WITH THIS
PROCEDURE SHALL BE INCLUDED IN ALL EXISTING
CONTRACTS (WITHIN 90 DAYS OF THE EFFECTIVE
DATE OF THIS POLICY OR AS SOON AS
PRACTICABLE)....


....


11. THIS POLICY IS EFFECTIVE IMMEDIATELY AND
SHALL BE CONSIDERED A LAWFUL GENERAL ORDER.
VIOLATION OF THIS GENERAL ORDER MAY SUBJECT
AN OFFENDER TO ADMINISTRATIVE OR DISCIPLINARY
ACTION UNDER THE UCMJ, CIVILIAN PERSONNEL
REGULATIONS, CONTRACT TERMS OR CRIMINAL
PROSECUTION UNDER US OR HOST-NATION LAW.

(Ex. G-328 at 1, 2, 6, 7; tr. 22/22)

66. KBRS had no notice of the 23 December 2005 CENTCOM Policy Statement/General Order until it received a Rock Island PCO letter dated 28 December 2006 attaching a modification of that order. The government did not initiate a modification to incorporate the policy/general order into Contract 0007 within 90 days as required by the order, and the contract was never so modified. (Ex. A-159; tr. 9/143-44, 22/20-25)

67. On 13 March 2006, CENTCOM issued General Order No. 1B (GO-1B) entitled "Prohibited Activities for U.S. Department of Defense Personnel Present within the United States Central Command (USCENTCOM) Area of Responsibility (AOR)." GO-1B expressly superseded GO-1A and further stated that "all waivers granted pursuant to GO-1A, are hereby rescinded and superseded." However, GO-1B retained the same paragraph 2.a. as in GO-1A, and did not in any manner address the use of PSCs to supplement government force protection. (Ex. G-5 at 13-18)

68. From September through December 2006, the Special Inspector General for Iraq Reconstruction conducted a survey of the security costs being incurred at that time by the contractors performing the reconstruction work. The total Iraq Relief and Reconstruction Funds (IRRF) spent on security costs as a percentage of total contract costs for each of the nine contractors responding to the survey ranged from a low of 7.6%

33

to a high of 16.7%. The average for all responding contractors was 12.5%. (Ex. A-161 at 2-3)

<u>The Government's Withholdings and the Contractor's Claims</u>

69. Ms. Kristan Mendoza was the Rock Island lead PCO for Contract 0007 for the period February–June 2006 and from October 2006 to the present (Testimonial Deposition, 18 Oct. 2012 at 14, 18). In response to Congressional inquiries about the use of PSCs by KBRS and its subcontractors on Contract 0007, Ms. Mendoza on 31 January 2007 obtained documentation from ESS that in March 2005, "Security" was 12.55% of "our labor pricing in our subcontracts" (R4, tab 50 at 1, 14). From this data a Rock Island price analyst estimated that "Security" was eight (8)% of the total ESS subcontract billings.[6] With KBRS mark-ups, Rock Island alleged total cost billed to the government for ESS private security was $19,652,815.28. (R4, tab 60 at 16)

70. By letter dated 6 February 2007 and DCAA Form 1, No. 127 of the same date, the PCO and DCAA notified KBRS that they were respectively "adjusting payments" (PCO) and "suspending" costs (DCAA) in the amount of $19,652,815 associated with ESS' use of PSCs in performing its subcontracts under Contact 0007 (R4, tab 60 at 1-4).

71. On 29 August 2007, DCAA issued a "Report on Evaluation of [KBRS] Disclosure of Costs of Armed Private Force Protection Services Associated with [Contract 0007]." The report stated that subcontractor billings to KBRS for private security on Contract 0007 for the years 2003 to 2006 were $79,306,895.[7] The report also stated that the KBRS billings to the government under Contract 0007 in those years also included $20,371,798 of indirect allocations of private security costs incurred by the KBRS Middle East Regional Office (MERO). The total amount of the allegedly unallowable private security costs in the 29 August 2007 DCAA report was $99,678,695. (R4, tab 58 at 1, 5, 7-11)

---

[6] The "Estimated amount of security labor within [ESS] subcontracts" at Attachment 4 to the DCAA Form 1, No. 127, dated 6 February 2007 shows total payments for PSCs of $18,551,279.04 and total subcontract prices of $231,444,266.18 (R4, tab 60 at 16).

[7] The DCAA calculation of the subcontractor PSC costs was based on the estimated PSC costs provided by 21 subcontractors which amounted to 1.78 percent of their total subcontract billings to KBRS. However, this estimated percentage of the PSC costs of 21 subcontractors was also applied by DCAA to the total billings of another 44 subcontractors who had not provided any estimates of their PSC costs. The result of this added calculation raised the government claim for the subcontractor PSC costs by $35,317,266. (R4, tab 58 at 7-10)

34

72. On 22 October 2007, KBRS submitted a certified claim to the Rock Island PCO under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109, for payment of the $19,652,815 withheld by the government in the PCO's letter of 6 February 2007 and the DCAA's Form 1, No. 127, of the same date (R4, tab 59). The PCO did not respond as required by the CDA with either a decision within 60 days of receipt of the claim or with a date by which a decision would be issued. On 24 March 2008, KBRS appealed the deemed denial. The appeal was docketed as ASBCA No. 56358.

73. On 3 August 2009, the DCAA issued a Form 1, No. 127 Revision-1, replacing the 6 February 2007 Form 1, No. 127, in its entirety and disapproving $103,397,086 for alleged costs of PSCs charged to Contract 0007. The amount in the Form 1, No. 127 Revision-1, was the total estimated direct and indirect private armed security costs in the 29 August 2007 DCAA Report ($99,678,695) for the years 2003 through 2006 plus $3,718,391 in KBRS mark-ups on those costs for that period. (ASBCA Nos. 57151, 57327, R4, tab 72 at 3-9)

74. The total PSC security cost alleged in the DCAA Form 1, No. 127 Revision-1, ($103,397,086) was 2.32% of the related subcontractor total billings ($4,449,152,680). As a percentage of total billings, the PSC security costs of KBRS and its subcontractors as alleged in the DCAA Form 1, No. 127 Revision-1, (2.32%) were substantially lower than the PSC security costs of the Iraq Reconstruction contractors (12.5%) that were performing in substantially the same security situation at the same period of time (*see* finding 68). On this evidence, we find that the alleged PSC security costs of KBRS and its subcontractors at issue were reasonable as to amount.

75. On 24 August 2009, KBRS submitted an invoice under Contract 0007 for payment of $22,279,678.49. On or about 1 September 2009, the government withheld the entire amount of that invoice consistent with a recommendation in the DCAA Form 1, No. 127 Revision-1, that the ACO "take immediate action to recoup the disapproved costs." (ASBCA No. 57151, compl. and answer ¶¶ 23-24; 57151, R4, tab 72 at 3) On 20 October 2009, KBRS submitted a certified claim under the CDA for $21,131,743 of the withheld amount. When the PCO did not issue a decision on the claim, KBRS appealed the deemed denial on 19 March 2010. The appeal was docketed as ASBCA No. 57151. (Compl. and answer ¶¶ 4-6)

76. In March 2010, the government withheld an additional $2,126,531 from payments due under Contract 0007 for further recoupment of the disapproved costs in the DCAA Form 1, No. 127 Revision-1. On 16 June 2010, KBRS submitted a certified CDA claim for the remainder of the September 2009 withholding ($1,147,935.49) and the full amount of the March 2010 withholding ($2,126,531) for a total claimed amount of $3,274,466.49. (ASBCA No. 57327, compl. and answer ¶¶ 26-27) When the PCO failed

to issue a decision on this claim as required by the CDA, KBRS appealed the deemed denial on 20 August 2010. The appeal was docketed as ASBCA No. 57327. (*Id.* ¶¶ 4-6)

77. On 30 January 2013, the Rock Island PCO issued a "Contracting Officer's Final Decision for Form 1 #127 and Claims, Costs Relating to the Use of Private Armed Security on LOGCAP III Contract DAAA09-02-D-0007." The final decision found unallowable $55,620,591.55 of the $103,397,086 suspended/disallowed costs in the DCAA Form 1, No. 127 Revision-1, and the remaining $47,776,494.45 allowable. After deducting the amounts withheld by the government ($19,652,815.00 on 22 October 2007, $21,131,743.00 on 20 October 2009, and $3,274,466.49 on 16 June 2010) the final decision claimed an amount of $11,561,567.55[8] as owed to the government. (Ex. A-210 at 15) KBRS appealed this decision on 15 February 2013. The appeal was docketed as ASBCA No. 58559 and was consolidated for hearing and decision with ASBCA Nos. 56358, 57151 and 57327.

## DECISION

KBRS contends in its main brief that it is entitled to judgment on all of the appeals because the contracting officer's final decision of 30 January 2013 asserting a government claim of $55,620,591.55 (finding 77) was untimely (app. br. at 106-08). The government did not address this contention in its reply brief. The CDA requires that "Each claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 7103(a)(3). The Act also requires that "each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). "Accrual of a claim" is defined in FAR 33.201 in pertinent part as: "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known."

A government claim for recovery of payments made for allegedly unallowable costs of KBRS and its subcontractors using PSCs in connection with their performance of Contract 0007 accrued no later than 10 June 2005. *Raytheon Missile Systems*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,017-018. Prior to that date, on 29 August 2004, LTC O'Day knew that PSCs were being used instead of military escorts (finding 41). Prior to 10 June 2005, between April and August 2004, the DCMA Commander Iraq and Rock Island PCO Watkins knew that PSCs were being used for movement by KBRS personnel within Iraq (findings 47-48). Prior to 10 June 2005, on 24 March 2004, the KBRS contact at MCB, MAJ Sessoms, was told that PSCs were being used for convoys from Kuwait into Iraq (findings 58-59). Finally, on 10 June 2005, the government was

---

[8] The correct amount after the stated deductions is $11,561,567.06.

36

expressly advised that PSCs were being used to transport personnel to their respect sites in Iraq (finding 60).

On these findings, the contracting officer's final decision of 30 January 2013 was untimely and thus invalid and a nullity. We give it no further consideration and dismiss the appeal in ASBCA No. 58559 for lack of jurisdiction. *See The Boeing Co.*, ASBCA No. 57490, 12-1 BCA ¶ 34,916 at 171,680.

The grounds for the withholdings at issue in ASBCA Nos. 56358, 57151 and 57327 were that the government had previously paid the withheld amounts to KBRS for the costs of PSCs that it now believed were unallowable under the terms of the contract. The government cites CENTCOM GO-1A made applicable to the contract by Special Provision H-13, the promise of government force protection in Special Provision H-16, and the "Weapons and Training" provisions in Special Provision H-21, as prohibiting the use of PSCs to supplement the government force protection without the authorization of the Theater (CENTCOM) commander for support that these costs were unallowable.

In our 2 April 2012 decision denying appellant's motion for judgment on the pleadings, we specifically addressed Special Provisions H-13, H-16, H-21 and CENTCOM GO-1A. We held that none of these provisions categorically prohibited the use of PSCs or mandated Theater Commander authorization for their use. *Kellogg Brown & Root Services*, 12-1 BCA ¶ 35,001 at 172,016. After hearing and consideration of the record as a whole, we reaffirm those holdings as to the Special H clauses and CENTCOM GO-1A. Those clauses and GO-1A are clear. The extrinsic evidence offered by the government may not be used "to create an ambiguity where [the contract] language is clear." *HRE, Inc. v. United States*, 142 F.3d 1274, 1276 (Fed. Cir. 1998) (citing *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir.1994)).[9]

Subsequent to the award of the contract, CENTCOM recognized the use of PSCs in its 4 July 2004 WARNORD that required MNF-I to coordinate with other government agencies to protect U.S. government contractors through "A COMBINATION OF COALITION MILITARY FORCES, IRAQ SECURITY FORCES AND PRIVATE SECURITY COMPANIES." The CENTCOM WARNORD further stated that: "CONTRACTORS CONTINUE TO HAVE THEIR RIGHT OF SELF DEFENSE AND MAY, IN SOME CIRCUMSTANCES ARRANGE FOR CONTRACTOR SECURITY

---

[9] The government now contends that the KBRS proposal of 26 January 2004 to subcontract for armed convoy security was an admission that the contract prohibited the use of PSCs without Theater Commander approval (gov't br. at 122). We do not agree. The KBRS proposal was in response to a government request for a proposal to relieve the government from its contractual responsibility for protection of contractor convoys pursuant to the force protection clauses of the contract and task orders issued thereunder (findings 26-28).

WITH A PRIVATE SECURITY COMPANY." (*See* finding 39) Neither the DFARS 7040 (June 2005) clause that was added to Contract 0007 by Modification No. P00012 effective 27 November 2005, nor CENTCOM GO-1B issued on 13 March 2006, superseding GO-1A addressed the use of PSCs (*see* findings 61-62, 67).

The CENTCOM policy/general order dated 23 December 2005, requiring CENTCOM authorization on a case-by-case basis for use of PSCs was clear, but under its express terms, it was not applicable to existing contracts until it was contractually incorporated into those contracts. KBRS had no notice of the existence of the order until 28 December 2006, and there is no evidence that Contract 0007 was ever modified to include the 23 December 2005 policy/general order. (*See* finding 65)

The government has the burden of proof in establishing that a cost is unallowable by operation of a specific contract provision or regulation. *Space Gateway Support, LLC*, ASBCA No. 56592, 12-1 BCA ¶ 34,941 at 171,792; *Lockheed Martin Western Development Laboratories*, ASBCA No. 51452, 02-1 BCA ¶ 31,803 at 157,102. On this record, we find that the government has not carried its burden of proving that during the relevant period of performance (2003-2006) the terms of Contract 0007, the terms of the task orders issued thereunder, or the terms of any regulation prohibited the use of PSCs to supplement government force protection without the case-by-case authorization of the CENTCOM Commander. Moreover, under Special Provision H-13, only the guidance, instructions and general orders issued by the CENTCOM theater commander or designated representative were contractually binding on Contract 0007. The guidance, instructions, and general orders of military headquarters subordinate to CENTCOM (such as MNF-I and MNC-I), were not contractually binding under Special Provision H-13.

A preponderance of the evidence shows that during the years 2003-2006 the force protection provided by the government for Contract 0007 was not commensurate with the threat or with the protection provided to DoD civilians. A preponderance of the evidence also shows that the use of PSCs by KBRS and its subcontractors to supplement the government force protection during those years was reasonably necessary for accomplishment of the logistical support mission of Contract 0007 and the task orders thereunder. (*See* findings 13-60) A preponderance of the evidence further shows that the cost of PSC services used by KBRS and its subcontractors as alleged in the DCAA Form 1, No. 127 Revision-1, were reasonable as to amount (*see* findings 68, 74). On this record we conclude that, in the security conditions prevailing in Iraq in 2003-2006, the use of PSCs by KBRS and its subcontractors was reasonable as that term is defined in FAR 31.201-3(a) (*see* finding 8).

The government argues in its opening brief that: "If the government ever failed to provide adequate force protection...KBRS' remedy was delay" (gov't br. at 131). It repeats this argument in the conclusion of its reply brief where it states "absent permission to privately arm, the Contract solely permitted delay, which could be incurred

without cost to KBRS" (gov't reply br. at 75). Fortunately for the troops that depended on KBRS and its subcontractors for their life-support and other logistical support services, KBRS and its subcontractors did not adopt the attitude now suggested by the government as their only remedy for the government's failures to provide force protection. As Mr. Murray, the ESS DFAC subcontractor manager expressed it: "if you don't have a delivery coming in every third day, you're in trouble. You can't feed soldiers. That was unacceptable to us, as a caterer, and to our client KBR. We could not fail." (*See* finding 52) In this regard, we note that Contract 0007 was a "rated" order under which a failure to deliver within the required time, could be subject to criminal penalties (*id.*). *See Martin v. Halliburton*, 618 F.3d 476, 480 (5ᵗʰ Cir. 2010). Moreover, the government's argument presupposes that PSCs were prohibited under the terms of the contract. We have found otherwise.

We have carefully considered the government's arguments as to estoppel, an alleged CAS violation, and "political question." We find them without merit. The government's estoppel argument is that (i) KBRS misrepresented to the government that it was not using PSCs; (ii) that the government relied upon that misrepresentation; and (iii) the government was materially prejudiced by that misrepresentation. Whatever damages the government may have suffered as a result of any misrepresentation by KBRS as to its use of PSCs, they are not represented by the costs of the PSCs that we have found allowable and which the government is contractually bound to reimburse. We also find no "judicial estoppel" arising from the tort litigation cited by the government (gov't br. at 114, 132). There is no conflict between the KBRS position in the tort litigation that the government had the primary responsibility for force protection, and its position in the present litigation that the government had primary responsibility for force protection, but if it failed to carry out that responsibility, there was nothing in Contract 0007 that prohibited KBRS from hiring PSCs to the extent necessary to accomplish the logistical support mission.

The government allegation of a CAS violation is that PSC costs benefitting only Contract 0007 were charged to a KBRS Middle East Regional Office (MERO) overhead rather than as a direct cost to Contract 0007 (gov't br. at 128). The KBRS MERO was a "forward" home office for a number of KBRS contracts in the Middle East. The KBRS PSC services for all of its Middle East contracts were procured by MERO and those services were not confined to Contract 0007 (tr. 23/17-20). The government bears the burden of proving CAS violations. *Raytheon v. United States*, No. 2013-5004, -5006, slip. op. at 18 (Fed. Cir. April 4, 2014). On this evidence, the government has failed to prove any CAS violation.

As to the "political question" argument, the government states: "For KBRS to prevail, the Board must adjudge that the military force was inadequate and thus the PSCs were necessary. Such a task falls squarely within the political question doctrine and is thus non-justiciable." (Gov't br. at 146) We disagree. The "political question" doctrine

does not apply to the adjudication under the CDA of whether or not the government has met a contractual obligation to provide adequate force protection to the contractor. *See Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 858 (Fed. Cir. 1997) ("In government contract disputes…the initial determination in each dispute is made by one of the parties, i.e., the CO. Congress commanded [in the CDA] that the CO's decision on any matter cannot be denied Board review."). In any event, there is no real question that the government did not provide force protection on a consistent basis. Our findings reveal this lack of force protection was a constant problem and the commanding generals testified they did not have the resources to provide it.

We have also considered the government's numerous objections to the presiding judge's rulings limiting discovery, the number of documents, testimony of witnesses, the pages of brief, and excluding entirely classified documents pertaining to operations in Iraq that were still classified seven to ten years after the operations took place, and could not be disclosed to appellant's lead counsel who did not have a security clearance.[10] With the first of the appeals having been filed in March 2008, and after five years of discovery and motion practice, hearing on these appeals was finally held on 24 hearing days between 11 April and 25 July 2013. At hearing, 24 witnesses testified and 37,000 plus documents were received in evidence. These proceedings had to end at some point and the limitations on discovery, witnesses, documents and pages of briefs did not violate this Board's rules or the discretion inherently granted to tribunals to control their proceedings.

We sustain the appeals in ASBCA Nos. 56358, 57151 and 57327. In ASBCA No. 56358, KBRS is entitled to recover from the government $19,652,815 with interest under the CDA (41 U.S.C. § 7109(a)(1)) from 22 October 2007 until paid. In ASBCA No. 57151, KBRS is entitled to recover from the government $21,131,743 with interest from 20 October 2007 until paid. In ASBCA No. 57327, KBRS is entitled to

---

[10] The administrative burden of handling at hearing classified documents on tactical operations in Iraq occurring seven years to ten years ago (*see* gov't br., ex. 13) outweighed any perceived evidentiary benefit particularly since none of the documents were alleged by the government to be outcome determinative and involve the very question that the government alleges is a "political question," the amount of military force that was necessary.

$3,274,466.49 with interest from 16 June 2010 until paid. As previously stated above, ASBCA No. 58559 is dismissed for lack of jurisdiction.

Dated:  17 June 2014

MONROE E. FREEMAN, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 56358, 57151, 57327, 58559, Appeals of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

41